IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2025

IN RE EDEN B.[1] ET AL.

**Appeal from the Circuit Court for Marshall County
Nos. 2024-CV-15, 2024-CV-16     M. Wyatt Burk, Judge**

_____

**No. M2025-00617-COA-R3-PT**

_____

The trial court terminated a mother's parental rights to two minor children after finding that the mother abandoned the children through failure to support and subjected the children to severe abuse.  The mother appeals to this Court, and, discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Alexandria J. Egan, Fayetteville, Tennessee, for the appellant, Kelly S.

Jason C. Davis, Lewisburg, Tennessee, for the appellees, Kenny B. and Stephanie B.

**OPINION**

**BACKGROUND**

Brayden[2] B. and Eden B. (together, the "Children") are the minor children of Kelly S. ("Mother") and Rory B. ("Father").[3]  Following Father's death in 2022, Mother struggled with substance abuse which eventually resulted in a referral to the Department of Children's Services ("DCS").  Rather than have DCS remove the Children into the

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

[2] "Brayden" and "Braden" are both used in the record.

[3] Father is deceased and is mentioned only for context.

state's custody, Mother called Father's surviving parents, Stephanie B. and Kenny B. (together, "Petitioners") to pick up the Children. Even before Father's death, Petitioners were involved in the Children's lives and babysat them frequently for Mother and Father. According to Stephanie B.'s testimony, this occurred at some point in 2022, and the Children have resided with Petitioners ever since.

The record contains little information about the related DCS action. It is undisputed, however, that Brayden B. tested positive for marijuana around the time the Children went to live with Petitioners and that this drug exposure led to DCS's involvement. The record also shows that DCS alleged severe abuse as to Mother and that the Juvenile Court for Marshall County (the "juvenile court") held a hearing on December 2, 2022. By agreement of the parties, the juvenile court reserved the severe abuse issue based on Mother's agreement that "there would be no further issues and that she would cooperate with the department and work the tasks that had been implemented by the department." However, Mother was arrested on January 7, 2023, in Chapel Hill, Tennessee, and charged with possessing marijuana, methamphetamine, and firearms. According to a court order, Mother was also charged with possessing drug paraphernalia and driving on an expired license. According to Stephanie B., Mother's arrest occurred the day before Mother was supposed to exercise visitation with the Children. Consequently, the juvenile court suspended Mother's visitation in an order entered January 30, 2023. The juvenile court held another hearing on March 9, 2023, to consider the severe abuse allegation it previously reserved. Mother stipulated to a finding of severe abuse at the March 9, 2023 hearing based upon Brayden's positive drug screen. The juvenile court entered an order to this effect on March 21, 2023.

In the interim, the Children remained in Petitioners' custody. According to Stephanie B., both Children had delays upon coming into Petitioners' custody. Both Children had cavities, and Brayden suffered from anemia and would not eat solid food. Stephanie B. also testified to her relationship with Mother and the Children prior to their removal. Petitioners were very involved with the Children before their Father's death and even watched Eden during the day while Mother and Father worked. Stephanie B. stated that she always had concerns about the Children's living environment because the home appeared dirty and mice infested. Stephanie B. did not dispute that Mother attended visitation before the juvenile court suspended the visits; however, she testified that Mother was often late or had transportation issues. Following Mother's arrest in January of 2023 and the subsequent order suspending Mother's visitation, neither Stephanie B. nor the Children had any contact with Mother.

Petitioners filed the petition to terminate Mother's parental rights on February 13, 2024, in the Circuit Court for Marshall County (the "trial court"). As grounds for termination, Petitioners alleged severe abuse, abandonment by failure to support and visit,

and persistent conditions.[4]  Petitioners also alleged that terminating Mother's parental rights would be in the Children's best interests.  Mother answered the petition on February 27, 2025, arguing that she did not willfully abandon the Children and that termination is not in the Children's best interests.  The trial court held a final hearing on March 7, 2025, at which Mother, Stephanie B., and Mother's adult child and the Children's half-sister, Natalie S., all testified.

The trial court entered a final order terminating Mother's parental rights on April 7, 2025.  Therein, the trial court concluded that Petitioners proved the statutory grounds of severe abuse and abandonment by failure to support by clear and convincing evidence.  While Mother failed to visit the Children during the relevant statutory period, the trial court found that Mother's failure was not willful because Mother's attorney advised Mother not to seek contact with the Children.  Finally, the trial court also found that Petitioners proved, by clear and convincing evidence, that termination is in the Children's best interests.  In its best interests analysis, the trial court emphasized that the Children have not seen Mother in several years and that for Brayden, Petitioners' home is essentially the only home he has ever known.

Mother timely appealed to this Court.

## ISSUES

Mother raises three issues on appeal:

I.     Whether the trial court erred in terminating Mother's parental rights for severe abuse.

II.    Whether the trial court erred in terminating Mother's parental rights for failing to support the Children.

III.   Whether the trial court erred in concluding that terminating Mother's parental rights is in the Children's best interests.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann.

---

[4] While Petitioners allege this statutory ground, found at Tennessee Code Annotated section 36-1-113(g)(3), in their petition, they did not address it at trial, and the trial court did not address it in the final ruling.  Nor do the parties address it on appeal.  Accordingly, Petitioners appear to have abandoned the allegation that Mother's parental rights should be terminated for persistent conditions.

§ 36-1-113(c)).  "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence."  *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023).  This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]"  *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).  "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not."  *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

DISCUSSION

## *Grounds for termination*[5]

### *Abandonment by failure to support*

First, the trial court concluded that Petitioners proved, by clear and convincing evidence, that Mother abandoned the Children by failing to support them. Among other instances, abandonment occurs when,

(i)(*a*) If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(*b*) If the child is less than four (4) years of age, for a period of three (3) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2024).[6]

Here, one child was over the age of four when the petition was filed, while the other child was under the age of four when the petition was filed. Consequently, the relevant statutory period for purposes of abandonment is different for Eden and Brayden, respectively. Petitioners filed the petition on February 13, 2024, so the relevant period as to Brayden is November 12, 2023 through February 12, 2024. The statutory period

---

[5] Some of the statutory grounds for termination alleged by Petitioners were not proven at trial. Petitioners do not raise this as an issue on appeal.

[6] In termination cases, we apply the version of the statute in effect at the time the petition to terminate was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). Accordingly, all references herein are to the version of Tennessee Code Annotated that was in effect on February 13, 2024.

applicable to Eden is October 12, 2023 through February 12, 2024.[7]  Regardless, it is undisputed that Mother has never paid any child support for either of the Children. Accordingly, the trial court found as follows:

> [ ] Petitioners argue that Mother has abandoned the Minor Children by her failure to support the Minor Children or has willfully failed to make reasonable payments toward the support of the Minor Children. As previously mentioned, Mother has not paid any support to the Petitioners for the Minor Children since their removal. During this time, Mother was not disabled. She could have applied for a job more in line with her skillset but chose not to do so. Finally, she "put aside her pride and ego" and applied to Dollar General, successfully landing a job. Even then, after earning a wage, Mother did not make any payments of support. Point being, she had the ability to pay between the period of October 12, 2023, to January 12, 2024, and simply chose not to do so. During the requisite period of time, Mother had a cell phone and smoked cigarettes. Even if Mother was unable to pay a substantial amount of support, she could have made some reasonable payments toward the support of the Minor Children. She simply chose not to do so. The Court further finds Mother's excuse of fearing "violating a no-contact order" by sending money to the Petitioners unavailing. As such, the Court finds by clear and convincing evidence that Mother willfully failed to support the Minor Children during the four months immediately preceding the filing of the Petition.

We agree with the trial court that Petitioners proved this ground for termination by clear and convincing evidence.  Mother conceded at trial and concedes on appeal that she has never paid child support.  She argues, however, that her failure was not willful and that she did not know she had the responsibility to pay child support.  Nonetheless, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"  Tenn. Code Ann. § 36-1-102(1)(H).  The plain language of this statute is clear, and Mother's argument is thus unavailing. Mother argues on appeal that Petitioners did not prove this ground for termination, noting that the trial court ultimately agreed with Mother that her failure to *visit* was not willful because Mother had a good faith belief that she could not contact the Children.  However, these are separate grounds.  Moreover, failure to support is different, because of the statutory presumption that every adult parent knows they are responsible for child support.  We are also unpersuaded by Mother's argument on appeal that she could not work for an extended period due to anxiety and depression.  These are not reasons to leave children without financial support.

We affirm the trial court's ruling as to this ground for termination.

---

[7]  The day the petition is filed, in this case February 13, 2024, is not included in this calculation.

*Severe abuse*

Next, the trial court concluded that Petitioners proved severe abuse by clear and convincing evidence. Parental rights may be terminated when

> [t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Among other things, severe abuse is defined as "[k]nowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]" Tenn. Code Ann. § 37-1-102(b)(27)(E). This ground may be satisfied when the child's drug exposure occurs in utero or during breastfeeding. *See In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *11 (Tenn. Ct. App. June 22, 2023) (collecting cases in which parental rights were terminated for severe abuse when the child or children tested positive for illegal substances at birth).

Here, the trial court determined that Petitioners proved severe abuse by relying on the juvenile court's order in which Mother stipulated to severe abuse. The stipulation was based upon Brayden testing positive for marijuana at age two. Often, a trial court hearing a termination petition will apply *res judicata* to the severe abuse allegation when a juvenile court has found, in the separate dependency and neglect proceedings, that the child or children at issue suffered severe abuse. *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012) ("This court previously applied the doctrine of *res judicata* to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding . . .").

In this case, however, Mother argues on appeal that the trial court erred in applying *res judicata* because the juvenile court order in which Mother stipulated to severe abuse is not final. And *res judicata*

> applies when "an existing *final* judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990).

*Id.* (emphasis added). Accordingly, to determine whether the trial court erred as to this ground for termination, we must determine whether the juvenile court order relied on is a final order.

We consider this question against the backdrop of juvenile dependency and neglect proceedings.  When a child is alleged to be dependent and neglected, the court hearing that petition shall determine whether

> the child was dependent and neglected as defined in § 37-1-102(b)(13)(G), or if the court so finds regardless of the grounds alleged in the petition, the court shall determine whether the parents or either of them or another person who had custody of the child committed severe child abuse. The court shall file written findings of fact that are the basis of its conclusions on that issue within thirty (30) days of the close of the hearing or, if an appeal or a petition for certiorari is filed, within five (5) days thereafter, excluding nonjudicial days. If the court finds the child is dependent and neglected, a dispositional hearing shall be held. In scheduling the hearing, the court shall give priority to proceedings in which a child has been removed from the child's home before an order of disposition has been made.

Tenn. Code Ann. § 37-1-129(b)(2).  The "statutes and rules governing procedure in the juvenile courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings."  *In re Audrey S.*, 182 S.W.3d at 874 (citing various statutes).  The "preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing."  *Id.* at 875.  As this Court has previously explained:

> There are essentially two phases to a dependency and neglect proceeding, assuming there is an initial finding of dependency and neglect. Specifically, Tenn. Code Ann. § 37-1-129 (2005) requires an initial hearing on the dependency and neglect petition and, if a child is found to be dependent and neglected, the court must proceed with a disposition of the case.

*In re Hannah S.*, 324 S.W.3d 520, 525 (Tenn. Ct. App. 2010).  The dispositional hearing is the final step after which a parent or guardian may appeal the juvenile court's ruling. *See id.* at 527 (explaining that "in order for [a parent or guardian] to appeal the order entered on the *adjudicatory* hearing, [he or she] need[s] to file [the] notice of appeal within ten (10) days of entry of the order on the *dispositional* hearing" (emphasis added)).

In this case, Mother argues on appeal that the order in which the juvenile court found severe abuse as to the Children is not a dispositional order and, therefore, is not a final, appealable order.  Mother claims that because the order is not final, the trial court could not apply *res judicata* to the severe abuse allegation in the termination proceedings.[8]  To

---

[8] To clarify, dependency and neglect proceedings are separate from termination proceedings. *In re Carrington H.*, 483 S.W.3d at 536 (citing *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004)).

reiterate, the first hearing regarding dependency and neglect took place on December 2, 2022. At that time, the juvenile court reserved ruling on severe abuse to afford Mother the opportunity to correct some of her behaviors. Mother was arrested shortly thereafter, so the juvenile court held another hearing after which it entered the disputed order. In said order, the juvenile court found, by clear and convincing evidence, that Brayden was severely abused. The juvenile court also ruled that the Children would remain with Petitioners pending further court action. Finally, the juvenile court set a hearing for September 18, 2023, noting that this hearing would be a "post-disposition" hearing.

Based on the foregoing, it appears that the order in the record is in fact a dispositional order. While the order is labeled "Amended Adjudication Hearing Order," the order's substance speaks to a dispositional hearing. The order states that Brayden was severely abused, provides that the Children should remain with Petitioners, and sets a "post-disposition" hearing. Although Mother claims this order is not final, it is unclear what the juvenile court had left to do. As best we can discern from the scant information about the juvenile court proceedings,[9] it seems likely that the adjudicatory hearing and dispositional hearing took place at the same time. This is not uncommon in dependency and neglect cases. As this Court explained in *In re Hannah S.*, it is "certainly possible that the dispositional phase [takes place] immediately after the hearing where the child was found dependent and neglected." 324 S.W.3d at 528 n.2. Our statutes "encourage[ ] the juvenile court[s] to 'proceed immediately' to the dispositional phase." *Id.* In such cases, "there may [be] only one order entered which addresse[s] both phases. In other words, the order entered following the 'adjudicatory' hearing and the order addressing the disposition may [be] the same order." *Id.*

Ultimately, however, it is difficult to come to a definite conclusion about the finality of the juvenile court's order given the limited information before us. This is especially true given that Petitioners agree in their brief that the juvenile court proceedings are ongoing. The question thus becomes whether Petitioners proved, by clear and convincing evidence, that Mother's parental rights should be terminated for severe abuse even if that conclusion does not turn on *res judicata*. Stated differently, can Mother's parental rights be terminated for severe abuse even if the juvenile court's order is not final?

We conclude that they can. A parent's rights may be terminated for severe abuse where "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court . . ." Tenn. Code Ann. § 36-1-113(g)(4). Nothing in section 36-1-113(g)(4) provides that the prior order must be a final order. Use of the term "any prior order" in the statute suggests an adjudicatory or

---

[9] There are only two documents from the juvenile court proceedings in the record—the order entered following the December 2022 hearing and the order in which Mother stipulated to a finding of severe abuse.

dispositional order will suffice. Even if the March 21, 2023 order is an adjudicatory hearing order only, it is still a "prior order of a court" finding that Mother committed severe abuse against a child. *Id.* Further, this order is proof of severe abuse as to Eden as well because section 36-1-113(g)(4) states grounds for termination exist when a parent is found to have committed severe abuse as to "any child."

Mother stipulated to the finding of severe abuse as to Brayden in the juvenile court and did not deny this at trial. Mother conceded at trial that she smoked marijuana while breastfeeding Brayden.[10] Consequently, the plain language of section 36-1-113(g)(4) is satisfied here, and the trial court did not err in terminating Mother's parental rights for severe abuse.

Accordingly, we affirm the trial court as to this statutory ground.

### *Best interests*

In addition to proving at least one statutory ground, termination petitioners must prove by clear and convincing evidence that the child's best interests are served by terminating the parent's rights. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interest analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must be viewed from the child's, rather than the parent's, perspective.").

When determining whether termination is in a child's best interests, we refer to twenty non-exclusive factors found at Tennessee Code Annotated section 36-1-113(i)(1). Here, the trial court correctly applied those statutory factors as follows:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> The Court finds that termination of Mother's rights will provide for stability and continuity of placement throughout the Minor Children's minority. As testified by [Stephanie B.], both Braden and Eden are now thriving in their

---

[10] The court hearing the termination petition can also find severe abuse based upon proof presented at the termination proceeding. Tenn. Code Ann. § 36-1-113(g)(4). Thus, even aside from the juvenile court proceedings, the proof at trial established that Mother severely abused the Children by exposing Brayden to an illegal or controlled substance that resulted in him testing positive on a drug screen.

current environment. They are both well-adjusted at the home of [Petitioners] and have a tremendous support group. They are both excelling scholastically, and are beginning to emerge from the trauma that they have sustained.

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

As previously mentioned, both Eden and Braden are doing well. Eden is involved in extracurricular activities and is currently making good grades in school. Braden is receiving therapy with his speech delays. Both Minor Children have been in the Petitioners['] household in excess of two years now. As indicated by [Stephanie B.], [Petitioners'] home is really all that Braden has known. It was indicated at trial that Eden does not wish to talk about her Mother, and to do so would be a "trigger." The Court is fully convinced that termination of Mother's rights and adoption by Petitioners is in the Minor Children's best interest.

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

Ever since the Minor Children moved in with the Petitioners in Franklin, Tennessee, all of their basic needs have been provided by the Petitioners. Mother has not paid anything towards their necessities. Mother has not been involved in the Minor Children's educational needs. The Minor Children clearly were not safe in the care and custody of Mother. As indicated by Natalie, smoking marijuana was a common thing in Mother's household. The Court does not intend to make this statement harshly, but simply wants to emphasize the level of disconnect that Mother has had with regard to the Minor Children's safety needs.

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

The Minor Children have not seen their Mother in excess of two years. It would be difficult to argue that they have a secure and healthy attachment today at eight (8) and four (4) years of age. As indicated by [Stephanie B.], Eden does not wish to talk about her Mother and it is doubtful that Braden would even recognize Mother. There does not appear to be any present attachment to Mother by either child, and it is not reasonable that such parental attachment could be recreated at this stage.

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

As previously mentioned, Mother has not seen the Minor Children in excess of two years. She has made no effort to see either of the children since cessation of therapeutic visitations.

(F) Whether the child is fearful of living in the parent's home;

The Court heard testimony that Braden does not really remember his Mother or his prior home. Furthermore, the Court heard testimony that Eden does not wish to talk about her Mother.

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

[Stephanie B.] testified that Eden has attended therapy and grief counseling due to the loss of her father and essentially her mother. Eden is not currently seeking counseling. [Stephanie B.] believes that a "trigger" would happen with Eden if placed back with Mother. Given his age at removal, Braden likely does not remember [Mother's] household.

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

As previously mentioned, the Minor Children have a tremendous relationship with the Petitioners. They have consistently been a staple in their lives. They have attended school functions, church, and extracurricular activities with the Minor Children. It is most evident that the Minor Children and the Petitioners have created a strong parental attachment over the past two years.

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

The Court heard testimony that the Minor Children enjoy a wonderful relationship with the adult children of the Petitioners (uncles). Also, the Court heard testimony that Natalie and Eden had a good relationship prior to her removal from Mother's home. The Court is confident that once trust is

recreated, the Petitioners will allow the Minor Children to have reasonable contact with Natalie.

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

The Court does believe that Mother has made great strides in her recovery from her addiction. As to whether such changes will be "lasting," only time will tell. The Court has some reservation that she was able to hide her use of illicit drugs and gun possession from [Mother's boyfriend] or, perhaps, he was so disengaged in the household that he simply did not recognize the issues.

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

Mother has certainly taken advantage of available recovery programs. She has attended inpatient treatment, numerous therapy meetings, and continues to attend her local AA. The undersigned is pleased with such announcement and hopes that she continues on her road to recovery.

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

Efforts were certainly made by DCS to assist Mother, even to the extent of reserving a damaging finding of severe child abuse to a future date. Despite the Department's efforts, Mother thwarted their show of goodwill by committing serious crimes.

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

As mentioned above, Mother has taken no real action to reinstitute visitation with the Minor Children. Conversely, she has taken steps to address her own personal issues.

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

The Court has not heard any testimony that would indicate that anyone residing in or frequently visiting Mother's home or the home of the Petitioners would be a danger to the Minor Children. The Court heard limited testimony about Natalie's use of an illegal substance. The undersigned does believe that such was an isolated event likely birthed in the midst of difficult and unique circumstances.

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

The Court heard very little proof on this issue. Mother has three children, all of which were removed from her custody. Natalie indicated that she did not return to Mother's home and now has established her own residence. Despite her difficult circumstances, the Court was proud to hear that Natalie has a job, a vehicle, and has plans to attend college in the fall. The Court hopes that she continues her plans towards a path of success.

[Mother's boyfriend] has a child that visits their home every-other-weekend; however, the Court is unable to ascertain the level of stability created.

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

Given the time that has elapsed since Mother has seen the Minor Children, the Court would find it difficult for Mother to presently understand what the Minor Children would need in order to thrive in her care and custody. The Court does find that Mother certainly understood and was convinced that the Petitioners would love, nurture, educate, and protect the Minor Children when she called them at the time of removal. This was a sacrificial and noteworthy decision on her part. It appears that she understands that the best chance for the Minor Children to succeed in life is to be with the Petitioners.

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive; and

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

Again, the Court heard limited proof on the current condition of Mother's home. She lives in a single-family residence in Chapel Hill, and such is owned by her boyfriend. The Court understands that it is in a safe neighborhood, and she makes efforts to keep the home clean. The Court does have some real reservations that if her present relationship dissolves, she will be without a stable home on her limited income. Conversely, the Petitioners have a well-appointed and suitable home for the Minor Children in a safe neighborhood where Eden enjoys riding her bicycle.

(S) Whether the parent has consistently provided more than token financial support for the child;

As mentioned throughout this Order, Mother has not paid a token of financial support since the removal of the Minor Children.

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child[;]

The Court heard limited testimony that Mother has experienced mental health issues and has sought treatment at Centerstone. The Court firmly believes that Mother was spir[a]ling downward even before [Father's] untimely demise. After such, she found herself in the depths of despair with no learned coping mechanisms. As a result, she resorted to self-medicating with illicit substances despite the fact that she had two precious children depending on her. It appears that Mother seems to be in a better mental posture currently, and the Court encourages her to continue to seek help despite the consequences of this Order.

In summary, the Minor Children were placed with the Petitioners by the Juvenile Court and, as testified by Mother, at her request. The Minor Children both have a loving, significant, close bond with the Petitioners as well as their adult children. The Petitioners take the Minor Children to doctor appointments, dentist appointments, and therapy. Also, Petitioners have taken an active role ensuring that the Minor Children perform well in school. Clearly, the Petitioners love and adore both Minor Children and it would be detrimental to remove either of them from their home, the home that they have become accustomed to.

Overall, the record preponderates in favor of the trial court's factual findings. Mother has not seen the Children in over two years, and Stephanie B. testified that Brayden essentially does not know who Mother is. While Eden, at age eight, most likely remembers Mother, she does not speak about her. We would be hard-pressed to conclude that the Children can form a bonded relationship with Mother under such circumstances. We also agree with the trial court that Mother appears to have significantly improved her overall condition. Mother testified that she completed extensive rehabilitation and mental health treatment following the Children's removal from her custody. Mother also testified that she now lives with her boyfriend in a safe neighborhood and has a steady job at Dollar General. Petitioners offered no proof to counter this testimony.

Nonetheless, the trial court rightly pointed out that Mother lives with her boyfriend and that she has no legal right to that residence. In some sense, then, Mother's living situation remains precarious. Although the trial court rightly gave credence to Mother's efforts, Petitioners can offer the Children a far more stable living environment than Mother. Further, despite Mother's improvements, she never made any meaningful effort over the last few years to earn back custody. Consequently, the Children are well-settled into their routine and community, and it would be extremely disruptive at this point to remove them. Under all these circumstances, we agree with the trial court's ultimate conclusion that terminating Mother's parental rights is in the Children's best interests.

## CONCLUSION

The ruling of the Circuit Court for Marshall County is hereby affirmed, and this case is remanded for proceedings consistent with this opinion. Costs on appeal are assessed to the appellant, Kelly S., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE